332 So.2d 175 (1976)
Edwin W. EDWARDS, Governor of the State of Louisiana
v.
Mary Evelyn PARKER, Treasurer of the State of Louisiana, Fenner, et al., Intervenors.
Darwin S. FENNER et al.
v.
Mary Evelyn PARKER, Treasurer of the State of Louisiana.
No. 57742.
Supreme Court of Louisiana.
May 5, 1976.
Rehearings Denied May 25, 1976.
Camille F. Gravel, Jr., Gravel, Roy & Burnes, Alexandria, Frank L. Maraist, Baton Rouge, Robert G. Pugh, Pugh & Nelson, Shreveport, John L. Avant, Dodd & Barker, Michael S. Baer, III, Baton Rouge, William D. Brown, Brown & Wicker, Monroe, for plaintiff-applicant Edwin W. Edwards, etc.
William J. Guste, Jr., Atty. Gen., Kendall L. Vick, Louis M. Jones, Asst. Attys. Gen., Donald Ensenat, Sam L. Levkowicz, Dept. of Justice, New Orleans, for defendant-respondent, Mary Evelyn Parker.
Harry B. Kelleher, Lemle, Kelleher, Kohlmeyer & Mathews, David J. Conroy, *176 Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, Thomas W. Leigh, Theus, Grisham, Davis & Leigh, Monroe, Thomas L. Raggio, Raggio, Farrar, Cappel & Chozen, Lake Charles, Victor A. Sachse, Jr., Frank P. Simoneaux, Breazeale, Sachse & Wilson, Baton Rouge, Thomas M. Bergstedt, Lake Charles, for plaintiffs Fenner, and others.
B. B. Taylor, Jr., Taylor, Porter, Brooks & Phillips, Baton Rouge, for intervenor-appellee La. State University and Agricultural and Mechanical College.
William J. Guste, Jr., Atty. Gen., Frederick W. Ellis, Special Asst. Atty. Gen., Lands and Natural Resources Section, intervenor for Governor Edwards.
DIXON, Justice.
We granted writs in these consolidated cases to determine disputes which have arisen concerning the disposition of funds received from the United States government as part of the settlement of the tidelands litigation.
Because of the importance of the questions to the State of Louisiana and to the operation of its government, all parties have requested expeditious treatment and determination of the issues.
On September 15, 1975 the State of Louisiana received two checks from the federal government. One was in the amount of $96,138,938.68, and the other was in the amount of $40,157,076.75. In the summer of 1975, when it became known that the tidelands funds would be forthcoming in the fiscal year 1975-1976, the Governor and the Treasurer of the State of Louisiana requested opinions from the Attorney General of Louisiana concerning the disposition of the funds. In the first opinion, to the Governor, the Attorney General concluded that the funds may be used to pay currently maturing bonded indebtedness, as well as that which would mature in future years. The Legislature subsequently added approximately $90,000,000 to the appropriations and capital outlay bills. After that legislative action, on August 5, 1975, the Attorney General's opinion to the Treasurer informed her that she could only make from the tidelands funds to be received, certain dedicated payments and pay bonds which matured during the fiscal year in which they were received, and only after that to pay for bonds in advance of maturity.
On September 26, 1975 the district court rendered judgment in favor of the plaintiff taxpayers and against the Treasurer, granting a preliminary injunction prohibiting the Treasurer from the disposition of the tidelands funds, except for their investment, for any purpose other than the payment of bonded indebtedness maturing after the end of fiscal year 1975-1976.
On March 23, 1976 the Treasurer filed an answer in the injunction suit, admitting the allegations of fact therein and praying for judgment according to law. That same day, the district court ordered the consolidation of the taxpayer suit with a suit for declaratory judgment filed by the Honorable Edwin W. Edwards, Governor, on March 16, 1976. The declaratory judgment action sought a declaration of the powers, authority and duties of the Governor, the Legislature and the Treasurer with respect to the receipt, deposit, distribution and use of the tidelands funds. Constitutional responsibilities of the Governor and the Legislature with respect to the operating budget and the capital outlay budget and the pressing need for certainty as to the proper disposition of the tidelands funds in time for the 1976 session of the legislature, due to convene May 10, 1976, justify the exercise of the supervisory jurisdiction of this *177 court and the expeditious termination of the causes.
The principal question to be decided is whether the funds received by the State in the tidelands settlement are available to pay the obligations of the State which fall due in the year in which the tidelands funds are received, thus freeing current revenues of the State, otherwise allocable for the payment of current debt, for other uses by the Legislature. Article 7, § 9 of the La. Const. of 1974 (see appendix for text) provides that, "All money received by the state. . . shall be deposited immediately upon receipt in the state treasury ...," and that the tidelands funds are not excepted. Once deposited, all money is credited to a special fundthe Bond Security and Redemption Fundwith certain exceptions. Thence each year there is an allocation sufficient to pay all current obligations secured by the full faith and credit of the State. The balance is then credited to the State general fund.
Article 7, § 9 of the La.Const. of 1974 was first adopted by the Convention on Monday, December 17, 1973. (Official Transcript of the Constitutional Convention, 1973, p. 41 of the 102nd day of the proceedings). Although there was considerable debate about which funds were to be covered and which excluded from the operation of this section, there was no mention of tidelands funds.
On the next day, December 18, 1973, debate commenced on what is now Article 14, § 10 of the La.Const. of 1974, and continued to December 19. (Official Transcript, p. 123ff., 103rd day; 104th day, p. 2). Article 14, § 10 is relied on by the taxpayers for the position that the tidelands moneys, when deposited in the treasury, should constitute a separate fund allocable generally to the prepayment of the bonded indebtedness of the State. Art. 14, § 10 provides:
"Funds derived from offshore mineral leases and held in escrow under agreement between the state and the United States pending settlement of the dispute between the parties shall be deposited in the state treasury when received. Upon such settlement, these funds and the interest from their investment, except the portion otherwise allocated or dedicated by this constitution, shall be used by the state treasurer to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state or shall be invested for that purpose. If any of these funds cannot be so expended within one year, the legislature may appropriate annually, for capital improvements or for the purchase of land, ten per cent of the remaining funds, not to exceed ten million dollars in one year."
Several reasons support the interpretation of the taxpayersthat the tidelands money fell into a special funds and not into the Bond Security and Redemption Fund. The first is the disclosure in the Official Transcript of the Constitutional Convention on p. 134 of the 103rd day that a delegate, Senator DeBlieux, proposed an amendment which would have placed the tidelands moneys in the bond and redemption fund. His amendment would have deleted all language in Art. 14, § 10 following the first sentence, and his argument was:
"I certainly feel like that the proper portion of this is to get those funds and deposit them in the state treasury and then let the set-up that we have that we have enacted by a statute, now incorporated into our law by constitutional amendment, manage those funds so that we can get the best use out of them. Now, here, if you take these funds and use them for retirement of the state *178 debt as has been indicated, as Senator Rayburn told you, we are just going to lose the management of our funds and possibly lose a great deal of interest which the state is now being able to get from these funds if they should ever come into the state treasurer. So, I ask that you adopt this amendment and, therefore, you might say undedicate these funds so that we can get the best management out of our funds."
The debate that followed expressed the fear of political factors that might prevent retirement of the bonded indebtedness by the legislature, confidence that the committee proposal would insure fiscal responsibility, a realization that tidelands money would be non-recurring income, that the sum involved was about $150,000,000, and that the Treasurer should be able to invest the money to make the most advantageous arrangement for the State in retiring the indebtedness.
The DeBlieux amendment was defeated by a vote of 16 to 73.
Other portions of the debate support the taxpayers' interpretation. One delegate said: "But, I think the intent is clear, the intent is to avoid the possibility of a legislature expending moneys that are suddenly received in one year in a great windfall for something other than first seeing to it that this State's debt is taken care of." (Supra, p. 130). On the next page a delegate referred to the matter as "dealing with a special fund."
Throughout the debate it was emphasized that, with small exceptions, Art. 14, § 10 of the 1974 La.Const. was a condensation of Art. 4, § 2(d) of the 1921 Constitution. (See appendix for text). At the time of the adoption of that article (added by Act 170 of 1965), it was hoped that funds recovered might be sufficient to retire the entire bonded debt of the State. Its essential provisions were: "Notwithstanding any other provision of this Constitution or of the laws of this state, all funds received . . . from revenues derived from tidelands mineral leases . . . held in escrow . . . shall be credited by the state treasurer to a special fund in the state treasury. So much ... as are needed . . . shall be expended . . . to purchase and retire in advance of maturity the callable bonds . . . Monies thereafter remaining . . . which cannot be expended immediately as hereinabove provided shall be invested . . . Out of the total funds remaining in the said special fund on the last day of each calendar year there shall be set aside such amount as is needed to pay the principal and interest on the outstanding bonded and other indebtedness . . . in the next succeeding calendar year . . . Thereafter. . ."
The 1921 constitutional provision clearly contemplated that the tidelands money would constitute a special fund, notwithstanding any other provision of law. A fair reading of the provision required the prepayment of all the State debt possible on receipt of the funds and the investment of that money which could not be so spent, which would then be used to pay what fell due in the next year. At the time of the adoption of this provision there was in effect R.S. 39:451, the statutory antecedent of Art. 7, § 9 of the 1974 Constitution which created the Bond Security and Redemption Fund.
Even in the absence of rather clear evidence of the intent of the drafters of the 1974 Constitution from the transcript of the proceedings, an appropriate and common method of interpretation would lead to the conclusion that the tidelands funds were not to be included in the Bond Security and Redemption Fund. Art. 7, § 9 and Art. 14, § 10 are in pari materiae. They should be interpreted to be complementary. Art. 7, § 9 was adopted first. Art. 14, § 10 is in the transition articles. Art. 14, § 10 is a special section dealing with a special situation. The organization *179 of the Constitution and the procedure of its adoption seem to make it clear that the tidelands funds were not intended to fall within the provisions of Art. 7, § 9.
The Governor's contention that the tidelands money may be used to reduce the bonded indebtedness of the State which matures in the fiscal year of receipt is based in part on the use of the word "or" in the phrase "purchase, retire, or pay in advance of maturity." The argument is in Art. 14, § 10 that the Constitution provides for three separate and distinct uses of the tidelands money: (1) purchase of outstanding bonds, including those that mature in the fiscal year of receipt; (2) retirement of outstanding bonds at maturity, including those maturing during the current fiscal year; and (3) payment in advance of maturity of outstanding bonds.
We cannot agree with this interpretation. Art. 14, § 10, as originally proposed to the delegates, provided that the tidelands money "shall be used by the treasurer in the purchase, retirement, and payment in advance of maturity of the bonded indebtedness of the state." 34 Proceedings (103rd day, December 18), p. 124. It was with the word "and" that the section was debated and adopted without a negative vote. 34 Proceedings (104th day, December 19), p. 12. We therefore conclude that the subsequent change from "and" to "or," proposed by the Committee on Style and Drafting and accepted by the Committee on Natural Resources and Environment (in which the article originated), without any indication of a substantive change, was a stylistic change only.
Therefore, we conclude that the tidelands funds cannot be employed to pay currently maturing bonded indebtedness of the State, and do not fall within the operation of Art. 7, § 9, but must be kept in a separate fund and used by the Treasurer as provided in Art. 14, § 10. Both Art. 7, § 9 and Art. 14, § 10 must be interpreted to be fully operative. The Bond Security and Redemption Fund is to pay current debt; the tidelands moneys are for the prepayment of the State's bonded indebtedness. (As used in this opinion "prepayment" means "purchase, retire or pay in advance of maturity" as used in Art. 14, § 10 of the Constitution of 1974).
One further dispute must be resolved, because the check in the amount of $40,157,076.75 did not represent income from royalties or other payments under the provisions of the leases, but represented severance taxes. Counsel for the Governor contend that the severance tax fund is different from "funds derived from offshore mineral leases," and should be governed by Art. 7, § 9.
Pursuant to a 1953 statute (now 43 U.S.C. 1336), authority was granted to representatives of the United States to enter into agreements with the States for the operation of oil and gas leases on lands claimed by both the United States and the States. Such agreements were to provide for impounding "rents, royalties, and other sums payable thereunder."
In 1956 such an agreement was made by the United States and Louisiana, under which the lessees of the disputed tracts, operating under leases from the State of Louisiana, would deposit in escrow, in addition to royalties due the State under the leases, an amount equal to that which would be due the State for severance taxes. Severance taxes in Louisiana are excise taxes imposed upon the right to produce or sever products from the land. Bel Oil Corp. v. Roland, 242 La. 498, 137 So.2d 308 (1962).
The royalties received were due the State of Louisiana from production under leases from the State on lands whose ownership was in dispute, but finally determined to belong to the State. The production of oil under the leases would have created the tax liability to the State in the absence of the disputed ownership. The federal statute and the agreement thereunder provided for *180 the impoundment of the royalties and the severance taxes. Only by a most strained interpretation could it be said that the severance tax funds were not "funds derived from offshore mineral leases and held in escrow under agreement between the state and the United States pending settlement of the dispute . . ." as spelled out in Art. 14, § 10. It is even more certain that royalties and severance taxes must be treated alike when we consider that the 1921 Constitution and the 1974 Constitution provided for the disposition of the same funds, and that the 1974 Constitution only simplified the definition of the funds. The 1921 Constitution, in Art. 4, § 2(d), referred to "all funds received by the state of Louisiana. . . from revenues derived from tidelands mineral leases and now or hereafter held in escrow under an agreement . . ." "Revenues," by definition, includes taxes. In the 1974 Constitution "revenues and royalties" appear together, and do not seem redundant. ("Revenues and royalties obtained from minerals located beyond the seaward boundary of the state belong to the state." Art. 9, § 6).
We conclude therefore that both the sums attributable to royalties and to severance are governed by the provisions of Art. 14, § 10, and do not fall within the provisions of Art. 7, § 9 of the 1974 Constitution, and do not fall into the Bond Security and Redemption Fund.
Since we conclude that Art. 7, § 9 and Art. 14, § 10 are complementary, and that Art. 7, § 9 forms part of the permanent machinery of the government, and that Art. 14, § 10 is part of the transitional material of the Constitution of 1974, it is apparent that Art. 14, § 10 is destined for near self-destruction. Art. 7, § 9 provides for the payment of current obligations secured by the full faith and credit of the State. Art. 14, § 10 provides that the tidelands funds are restricted to the prepayment of such obligations, or the investment of such funds for that purpose. In clear and unmistakable language, it is provided that, if any of the tidelands funds cannot be expended within one year (from receipt), ten percent of the balance remaining each year not to exceed ten million dollars a year is available to the Legislature for appropriation for capital improvement or the purchase of land. There is no room for interpretation in the article that tidelands funds may be used for payment of current debt, in order to free the recurring revenues of the State from the "pledge" of Art. 7, § 9, the payment of current debt.
It is to be noted, of course, that Art. 14, § 10 makes an exception from the requirement that all funds from the tidelands settlement be used for repayment of the State debt: "except the portion otherwise allocated or dedicated by this constitution." We do not understand that there is any controversy at this time about this exception, and therefore express no opinion on the meaning of the phrase.
Many specific and hypothetical questions are propounded in the suit for declaratory judgment. We consider that this opinion has answered the only justiciable issues in the case; we are not authorized to depart from deciding justiciable controversies and enter the area of advisory opinions. C.C.P. 1871, et seq. As we stated in Abbott v. Parker, 259 La. 279, 249 So.2d 908 (La.1971):
"A `justiciable controversy' connotes, in the present sense, an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interests, and upon which the judgment of the court may effectively operate through a decree of conclusive character. Further, the plaintiff should have a legally protectable and tangible interest at stake, and the dispute presented should be of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."
*181 Therefore, for these reasons, there is judgment in the taxpayers' suit, Darwin S. Fenner et al. v. Mary Evelyn Parker, No. 185,033 on the docket of the 19th Judicial District Court, affirming the judgment of the district court ordering a preliminary injunction prohibiting the Treasurer of the State of Louisiana from using the funds received from the United States of America pursuant to the Interim Agreement of October 12, 1956 with the State of Louisiana, and pursuant to the decree of the United States Supreme Court, and the interest from their investment, except the portion otherwise allocated or dedicated by the Constitution, for any other purpose than the payment of bonded indebtedness of the State of Louisiana not maturing in the current fiscal year, July 1, 1975 through June 30, 1976, but maturing thereafter, through purchase, retirement, or advance payment, or investing such funds for that purpose, as provided in Art. 14, § 10 of the Constitution.
And further, there is judgment in the declaratory judgment action, Edwin W. Edwards, Governor v. Mary Evelyn Parker, Treasurer, No. 190,239 on the docket of the 19th Judicial District Court, decreeing:
(1) The tidelands funds are not covered by Louisiana Constitution Art. 7, § 9(B), and therefore do not fall into the Bond Security and Redemption Fund, but are covered exclusively by Louisiana Constitution Art. 14, § 10, and form a separate fund within the state treasury for the prepayment of the bonded indebtedness of the State, and as specified in Art. 14, § 10.
(2) Because the tidelands funds do not form part of the Bond Security and Redemption Fund, said funds are not available to pay obligations which are secured by the full faith and credit of the State which become due and payable from the Bond Security and Redemption Fund in any current fiscal year, including principal, interest, premiums, sinking or reserve fund, and other requirements.
(3) The $40,157,076.75, representing severance taxes due the State of Louisiana, are not to be treated differently from the $96,138,938.68, representing royalties, and are therefore excluded from the operation of Art. 7, § 9, and are governed by the provisions of Art. 14, § 10.
Affirmed and rendered.
SUMMERS, J., assigns additional concurring reasons.
TATE and CALOGERO, JJ., concur in part and dissent in part and assign reasons.
MARCUS, J., joins in the additional concurring reasons assigned by SUMMERS, J.
DENNIS, J., concurs in part and dissents in part and assigns reasons.

APPENDIX
Section 9. (A) Deposit in State Treasury. All money received by the state or by any state board, agency, or commission shall be deposited immediately upon receipt in the state treasury, except that received:
(1) As a result of grants or donations or other forms of assistance when the terms and conditions thereof or of agreements pertaining thereto require otherwise;
(2) by trade or professional associations;
(3) by the employment security administration fund or its successor;
(4) by retirement system funds;
(5) by state agencies operating under authority of this constitution preponderantly from fees and charges for the shipment of goods in international maritime trade and commerce; and
(6) by a state board, agency, or commission, but pledged by it in connection with the issuance of revenue bonds as provided in Paragraph (C) of Section 6 of this article, other than any surplus as may be defined in the law authorizing such revenue bonds.
(B) Bond Security and Redemption Fund. Subject to contractual obligations *182 existing on the effective date of this constitution, all state money deposited in the state treasury shall be credited to a special fund designated as the Bond Security and Redemption Fund, except money received as the result of grants or donations or other forms of assistance when the terms and conditions thereof or of agreements pertaining thereto require otherwise. In each fiscal year an amount is allocated from the bond security and redemption fund sufficient to pay all obligations which are secured by the full faith and credit of the state and which become due and payable within the current fiscal year, including principal, interest, premiums, sinking or reserve fund, and other requirements. Thereafter, except as otherwise provided by law, money remaining in the fund shall be credited to the state general fund.
(C) Exception. Nothing in this Section shall apply to a levee district or political subdivision unless the full faith and credit of the state is pledged to the payment of the bonds of the levee district or political subdivision.
2(d). Revenue from tidelands mineral leases; use of
Section 2(d). Notwithstanding any other provision of this Constitution or of the laws of this state, all funds received by the state of Louisiana during the calendar year 1966 and thereafter from revenues derived from tidelands mineral leases and now or hereafter held in escrow under an agreement executed by and between the state of Louisiana and the United States Government pending settlement of the claims of the state of Louisiana with regard to its portion of such revenues, but not including any portion of such funds derived from royalties received by the state from mineral leases which are required by the provisions of Article IV, Section 2 of the Constitution to be placed in the Royalty Road Fund to the credit of the parish from which production is had and not including any portion of such funds now dedicated or allocated to public education purposes, shall be credited by the state treasurer to a special fund in the state treasury.
So much of the monies credited to the special fund hereinabove provided for as are needed for the purpose shall be expended by the state treasurer, when authorized and directed to do so by the Board of Liquidation of the State Debt, to purchase and retire in advance of maturity the callable bonds or other evidences of indebtedness of the state of Louisiana or its agencies, boards and commissions. Monies thereafter remaining on deposit in said special fund, which cannot be extended immediately for the purpose hereinabove provided, shall be invested by the state treasurer, in such amounts as he in his discretion may deem advisable and in the best interest of the state. Such funds, including any interest earned thereon, shall be invested and reinvested in time certificates of deposit in state banks organized under the laws of Louisiana or national banks having their principal office in the state of Louisiana and in short-term United States Treasury bills and in bonds and other direct obligations of the United States Government.
Out of the total funds remaining in the said special fund on the last day of each calendar year there shall be set aside such amount as is needed to pay the principal of and interest on the outstanding bonded and other indebtedness of the state and its agencies, boards and commissions in the next succeeding calendar year, as hereinabove provided, and such funds so set aside shall be so used. Thereafter, not more than ten per centum of the total value of the said special fund remaining on the last day of each preceding calendar year, up to but not in excess of Ten Million Dollars, may be appropriated by the Legislature during the first calendar year following the adoption of this amendment in 1966 and in any calendar year thereafter, for capital improvements, including the purchase of land, architect and engineering fees, construction costs and equipment for buildings and other costs.
*183 This Section shall be self-operative and shall require no further or other legislation to place it into effect. (Added Acts 1965, No. 170, adopted Nov. 8, 1966.)
SUMMERS, Justice (concurring).
I believe, as the author of the opinion points out with respect to the 1921 Constitution, that a fair reading of Section 10 of Article XIV of the Constitution of 1974 requires the prepayment of all the State bonded debt possible on receipt of the funds and that the balance, if any, be invested for that purpose. Of course, if any of these funds cannot be so expended within one year, the legislature may, as Section 10 provides, appropriate annually for capital improvements or for the purchase of land, ten percent of the remaining funds, not to exceed ten million dollars in one year.
Although I believe that this is the meaning of the Court's opinion, and I subscribe to it in every respect, I add these concurring reasons to make clear what I understand the opinion stands for.
TATE and CALOGERO, Justices (concurring in part and dissenting in part).
In summary, for reasons to be stated more fully,
We concur (1) in affirming the district court judgment that tideland funds received during this fiscal year may not be used to retire state indebtedness becoming due during this year and (2) in affirming the general holding that tidelands must be used to reduce the bonded indebtedness of the state, with the limited exceptions below noted.
However, we dissent from the majority's holdings (1) that the portion of the funds received to pay severance tax liability upon the tidelands area are to be treated as tidelands funds, not tax revenues and (2) that the tidelands funds deposited in the state treasury may never form part of the Bond Security and Redemption Fund for any given year and may never be used, even if invested for that purpose, to pay any bonded indebtedness becoming due in the future within the fiscal year in which the payment is to be made.
Simply stated, we feel that, in reaching the latter holdings, the majority has converted into a constitutional strait-jacket provisions of our 1974 constitution which were, instead, intended to afford flexibility in the payment and securing of the bonded indebtedness of the state (subject, of course, to the constitutional restriction that the tidelands funds be used to retire preexisting state indebtedness falling due in any fiscal year subsequent to that in which they are paid).
By so doing, we are overlooking the fundamental purpose of our 1974 constitution to provide for a flexible framework of government, with a minimum of detailed restrictions and dedications which freeze the mechanics into a 1974 mold of the day and of future years and deprive the legislatures with full power to provide for the needs of the present.
The detailed reasons for these conclusions we set forth below.
We are also of the belief that the majority is in error in refusing to answer certain practical questions of administration of the public debt posed by this declaratory judgment action.[1] By characterizing them as raising "non-justiciable" issues, the majority shirks its judicial duty under our declaratory judgment code articles, La.C. Civ.P. art. 1871, to adjudicate issues clearly raised by the present litigation.
I. The Threshold Issue
The issues before us involve an interpretation of the constitutional provision in question. Before discussing important ancillary issues, we will first consider a threshold issue relating to the intent of the constitutional provision.
*184 Article 14, Section 10 of the Louisiana Constitution of 1974 provides:
"Funds derived from offshore mineral leases and held in escrow under agreement between the state and the United States pending settlement of the dispute between the parties shall be deposited in the state treasury when received. Upon such settlement, these funds and the interest from their investment, except the portion otherwise allocated or dedicated by this constitution, shall be used by the state treasurer to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state or shall be invested for that purpose. If any of these funds cannot be so expended within one year, the legislature may appropriate annually, for capital improvements or for the purchase of land, ten percent of the remaining funds, not to exceed ten million dollars in one year." (Italics ours.)
The threshold issue before us is whether, as the taxpayers contend, the italicized phrase prohibits the use of tidelands leasederived funds to purchase, retire, or pay any portion of the existing bonded indebtedness of the state which matures in the fiscal year of receipt (i.e., in the instance of the present payment, the fiscal year 1975-1976). The taxpayers contend this is the import of the state constitution's requirement that the tidelands proceeds be used "to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state." The state treasurer concurs in this interpretation.
On the other hand, the governor, the attorney general, and the board of supervisors contend that the unambiguous meaning of the provision is only that the tidelands funds be used to reduce the bonded indebtedness of the state existing on the date of their receipt. Thus, they argue, the contested wording provides alternative ("or") methods by which to reduce the indebtedness: (a) purchase of outstanding bonds; (b) retirement at maturity, including during the current fiscal year; and (c) payment in advance of maturity.
The precise issue raised by the opposing interpretations of the above-italicized wording is whether the phrase "in advance of maturity" modifies the entire preceding series of words (that is, "purchase, retire, or pay"); or whether instead it merely qualifies the last word in the series (that is, "pay").
Various rules of statutory interpretation, legislative drafting, and grammar are advanced with equal persuasiveness to support the opposing constructions urged upon us. The treasurer and the taxpayers suggest that the words "purchase, retire, or pay" have in the present context synonymous meanings. The state points out, on the contrary, that, in fact, the terms (a) "purchase"[2], (b) "retire"[3], "or" (c) pay *185 in advance of maturity"[4], may and do have different meanings, especially as separated by the disjunctive "or"; the wording should therefore be interpreted as listing alternative methods of accomplishing the single purpose envisioned by the provision, namely, the reduction of the state debt.
II. Intent of Drafters
Each of the two opposing constructions advanced may with equal reason be considered as reflecting the functional intent of the literal wording of the provisions; both opposing interpretations are included within the ordinary meaning of the language used. With regard to the limited issue before us, therefore, the intent of the constitution's drafters is not clearly reflected by the actual wording of the provision. Under this circumstance, it is appropriate for us to refer to the documents and debates of the constitutional convention to determine the legislative (constitutional) intent of the delegates to the convention who drafted the provision which was subsequently ratified by the people. 2A Sutherland, Statutes and Statutory Interpretation, Sections 45.05, 45.09, and 45.13 (4th (Sands) ed., 1973):
The provision, as drafted, clearly reflects a constitutional intent to apply tidelands funds to reduce the existing bonded indebtedness of the state. However, it does notin the light of the equally reasonable constructions advanced to usunambiguously provide that such tidelands funds must be used to reduce the debt only by paying bonded indebtedness "in advance of maturity". Nor does the constitutional phraseology of the provision itself require a construction, for which the taxpayers contend, that the tidelands escrow funds may not be used to pay any portion of the state's bonded indebtedness which matures in the same fiscal year as the funds are received.[5]
Reference to the records and debates of the constitutional convention clearly indicate a specific intent to continue by this provision the substance of a predecessor section of the 1921 constitution (to be cited and quoted below). See: State of Louisiana, Constitutional Convention of 1973, Verbatim Transcripts (39 Volumes; 1973-1974) (hereinafter cited as Proceedings, by volume number, date of debate, and page numbers) at: 34 Proceedings (103rd day, December 18) 123-39 and (104th day, December 19) 2-12; 38 Proceedings (117th day, January 14) 105 and (118th day, January 15) 13, 15; and 39 Proceedings (121st day, January 18) 187, 188-89, 198.
The provision of the 1921 constitution thus intended to be continued in substance by the 1974 constitution, was Louisiana Constitution of 1921, Article IV, Section *186 2(d). This was a 1966 amendment submitted to the people by Act 170 of 1965 and adopted by them.
The records of the Constitutional Convention clearly indicate that the drafters merely intended to shorten the 1921 provision, but to retain its substance. Senator Louis Lambert, chairman of the committee reporting the provision and recommending its adoption, so explained this as its meaning and substance. He stated that the section provides that tidelands funds not otherwise dedicated would be used to retire the state's bonded indebtedness "as did the previous article. . . . Basically what this does is retain the source provision in our present constitution." He further stated, "[w]e did not want to do anything to take away from the intent of the [prior] constitutional provision. As a result of that, we adopted it almost as it was. We tried to shorten it as much as we could and we shortened it quite a bit. But, we tried to retain the substance that was in the source provision . . . [W]e tried to keep intact as best we could the existing, the source provision, in our present constitution."
See 34 Proceedings (103rd day, December 18) 125-26.
Nowhere in the debates is any contrary intent set forth.
(The debates of the convention reflect a consistent intent, when retaining in substance prior constitutional provisions, to shorten[6] and simplify the language, and to use English rather than legalese in expressing the same concepts. Thus, a change in language does not necessarily indicate any change in meaning from a provision of the prior constitution so retained in simplified language.)
At the outset of this discussion, therefore, we shall set forth in the table below the text of the two constitutional provisions:

TABLE 1
Louisiana Constitution of 1974,
Article 14, Section 10:

Offshore Mineral Revenues; Use of Funds
Section 10. Funds derived from offshore mineral leases and held in escrow under agreement between the state and the United States pending settlement of the dispute between the parties shall be deposited in the state treasury when received. Upon such settlement, these funds and the interest from their investment, except the portion otherwise allocated or dedicated by this constitution, shall be used by the state treasurer to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state or shall be invested for that purpose. If any of these funds cannot be so expended within one year, the *187 legislature may appropriate annually, for capital improvements or for the purchase of land, ten percent of the remaining funds, not to exceed ten million dollars in one year.
of Article IV, Section 2 of the Constitution to be placed in the Royalty Road Fund to the credit of the parish from which production is had and not including any portion of such funds now dedicated or allocated to public education purposes, shall be credited by the state treasurer to a special fund in the state treasury.
So much of the monies credited to the special fund hereinabove provided for as are needed for the purpose shall be expended by the state treasurer, when authorized and directed to do so by the Board of Liquidation of the State Debt, to purchase and retire in advance of maturity the callable bonds or other evidences of indebtedness of the state of Louisiana or its agencies, boards and commissions. Monies thereafter remaining on deposit in said special fund, which cannot be expended immediately for the purpose hereinabove provided, shall be invested by the state treasurer, in such amounts as he in his discretion may deem advisable and in the best interest of the state. Such funds, including any interest earned thereon, shall be invested and reinvested in time certificates of deposit in state banks organized under the laws of Louisiana or national banks having their principal office in the state of Louisiana and in short-term United States Treasury bills and in bonds and other direct obligations of the United States Government.
Out of the total funds remaining in the said special fund on the last day of each calendar year there shall be set aside such amount as is needed to pay the principal of and interest on the outstanding bonded and other indebtedness of the state and its agencies, boards and commissions in the next succeeding calendar year, as hereinabove provided, and such funds so set aside shall be so used. Thereafter, not more than ten percentum of the total value of the said special fund remaining on the last day of each preceding calendar year, up to but not *188 in excess of Ten Million Dollars, may be appropriated by the Legislature during the first calendar year following the adoption of this amendment in 1966 and in any calendar year thereafter, for capital improvements, including the purchase of land, architect and engineering fees, construction costs and equipment for buildings and other costs.
This Section shall be self-operative and shall require no further or other legislation to place it into effect.
III. Analysis of Predecessor Constitutional Provision re Threshold Issue; Intent of 1974 Constitution's Section 10

The quoted predecessor provision of the 1921 constitution required tidelands funds when received to be placed into a special fund. From this fund, when authorized and directed by a political organ of government then entrusted with aspects of debt management, the treasurer was to expend monies "to purchase and retire in advance of maturity the callable[7] bonds or other evidences of indebtedness" of the state. (Italics ours.)
The section further provided that monies not so used should be invested so as to bear interest; and that, annually, "Out of the total funds remaining in the said special [invested] funds on the last day of each calendar year", a sum shall be set aside and used "to pay the principal of and interest on the outstanding indebtedness of the state ... in the next succeeding calendar year."
Thus, with regard to the specific issue before us, the predecessor provision directed that the funds be immediately used to reduce indebtedness "in advance of maturity" only before the end of the calendar year. However, the political agencies of the state were authorized and in fact directed to use the remainder of the funds annually thereafter to the extent "needed to pay the principal and interest" of the existing state indebtedness, either as it fell due or (by implication) in advance of maturity.
With regard to the specific issue before us, the general language of the 1974 constitutional provision may reasonably be interpreted to similar effect. In light of the constitutional intent to incorporate the substance of this predecessor provision in Article 14, Section 10 of the 1974 constitution, the proper interpretation of the provision[8] in the matter now at issue is:
1. The tidelands funds may not be used to pay bonded indebtedness already due at the time of the receipt of the funds or that *189 which falls due immediately thereafter. During an initial period after receipt, the funds may be used only to reduce bonded indebtedness in advance of its maturity.
2. However, the tidelands funds may be invested to pay bonded indebtedness not yet due, rather than being immediately used to pay such bonded indebtedness in advance of maturity. The convention debates[9] and the arguments before us indicate practical reasons why it may be financially advantageous to the state instead to invest the funds at the present high rates of interest in order to use the proceeds to pay off lowinterest obligations later, at their subsequent maturity. This, indeed, was the explicit purpose of the floor amendment explicitly permitting investment of the funds to pay obligations not yet mature rather than using the tidelands funds immediately for such purpose.[10]
3. The obligations not then due at the date of the receipt of the tidelands funds include the indebtedness of the next and succeeding years. Tidelands funds may be invested to pay these debts. That is, we can find no intent in the predecessor provision or the constitutional debates that directs the use of the funds only to longterm obligations of the state which would not ordinarily be paid from the revenues of the year in question.[11] No intent is reflected to prevent this so-called windfall to the legislatures of the succeeding years, whether consecutive to the receipt of the tidelands funds or long thereafter, by using *190 tidelands funds rather than current revenues to pay off obligations which mature in those succeeding years.
4. Unlike the predecessor provision, the 1974 section does not specify the initial period during which only debts not yet matured may be paid "in advance of maturity." (During this period, the tidelands funds may be invested to pay indebtedness maturing after expiration of the period, so as to pay such unmatured debts as they mature; rather than paying such unmatured debts immediately during this initial period, to the possible financial detriment of the state.) The 1974 provision does not itself clearly define this initial period, nor do the constitutional debates shed any light as to it. The issue thus addresses itself to judicial ascertainment.
Arguably, in view of the constitutional intent to retain the substance of the prior constitutional provision, this initial period could be the same as that specified by the predecessor provisioni.e., tidelands funds could be used to pay only debt maturing after the end of the calendar year in which the funds are received. However, to select this date (end of the calendar year) as the termination of the initial period when only unmatured debts may be paid, is to reach a construction not founded upon any constitutional language, without any clear constitutional intent to guide us to this result.
Arguably also, this initial period could terminate at the end of one year after date of receipt of the tidelands funds. This construction would be based upon the final sentence of the 1974 section, which provides that the legislature may annually appropriate, for land and capital improvements, ten percent of the "funds not so expended within one year" of receipt, not to exceed ten million dollars. No party so contends, however, perhaps because, in the context of the limited purpose of the sentence (see part V, question 8, below), ascribing this constitutional effect to the sentence is not founded upon any constitutional intent.
The taxpayers and the state treasurer argue that: Construing the constitution as a whole, it has made provision for the payment of obligations "which become due and payable within the current fiscal year", see Article 7, Section 9(B). This being so, tidelands funds should not be used to pay such obligations as they mature during the fiscal year of the receipt of the funds, in view of the constitutional intent of Article 14, Section 10, that only unmatured debts may be paid by tidelands funds during some initial period after the state receives them. Implicit in this limited prohibition upon the use of tidelands funds is that, during this initial period after receipt, they should be used to pay only unmatured obligations which would not otherwise be paid.
We find this last to be the most reasonable of the interpretations available to us. It is based upon constitutional language, and it implements the functional intent of Section 10's limitation upon the use of tidelands funds, during an initial period after receipt, to pay only "in advance of maturity" some of the existing bonded indebtedness of the state.
We therefore would conclude that tidelands funds may not be used or invested to reduce any of the bonded indebtedness of the state which are due and payable during the fiscal year of their receipt by the state. See also part IV of our opinion below. We thus to this extent affirm the ruling of the trial court in granting a preliminary injunction in the taxpayers' suit, Fenner et al. v. Parker, Treasurer.
IV. Relationship of Article 7, Section 9 to Article 14, Section 10
In the construction we have reached of Article 14, Section 10, we have not discussed the state's contention that Article 7, Section 9 of the 1974 constitution mandates the use of tidelands funds to pay debts maturing during the fiscal year of receipt. We did not reach this argument, in view of our finding of a clear constitutional intent to prohibit use of tidelands funds *191 to pay indebtedness maturing during an initial period following the funds' receipt.
Nevertheless, we deem it appropriate at this point to discuss the relationship of the two constitutional provisions, not only because of this contention of the state, but also because of an ancillary contention raised by the taxpayers in connection therewith.
Section 9 of Article 7 (Revenue and Finance) is entitled "State Funds". Subsection A provides: "All money received by the state or by any state board, agency, or commission shall be deposited immediately upon receipt in the state treasury, except [exceptions immaterial to the present discussion] * * *." Subsection B provides that "all state money deposited in the state treasury shall be credited to a special fund designated as the Bond Security and Redemption Fund. . . . In each fiscal year an amount is allocated from the bond security and redemption fund sufficient to pay all obligations [maturing during the fiscal year] . . . . Thereafter, except as otherwise provided by law, money remaining in the fund shall be credited to the state general fund."[12] (Italics ours.)
(We should here note, as conceded by all parties, that, whether or not the tidelands funds may ever form part of the bond security and redemption fund, they do not revert to the general fund for general appropriation. Article IV, Section 10, dedicates their use (with exceptions not here pertinent) to reduction of the bonded indebtedness of the state existing on the date of the receipt of these funds. The italicized phrase, "except as otherwise provided by law", expressly directs recognition of such "other" disposition of law.)
Article 14, Section 10 (see Table 1), provides that, when received, tidelands funds "shall be deposited in the state treasury". It also provides that these funds, "except the portion otherwise allocated or dedicated by this constitution," shall be used "to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state or shall be invested for [such] purpose."
The state argues that, upon deposit of the funds into the state treasury, they are immediately "allocated" to pay currently maturing debt, by operation of Article 9(B). The taxpayers contend, to the contrary, that the tidelands funds are never credited to the bond security and redemption fund established by that section, since Article 14, Section 10, is a special directive that such funds be maintained as a special fund.
With regard to the state's contention:
Although the funds are deposited in the state treasury, no portion of these tidelands funds is allocated to payment of the currently maturing debt. To do so, is to defeat the express intention of Article 14, Section 10, previously noted; which is not to use such tidelands funds for debt matured at the time of their receipt or maturing within a limited period thereafter. This special provision of Section 10, to this extent, excepts tidelands funds and interest upon their investment from being so used by applying to them the general provisions of Article 7, Section 9(B).
*192 The reference to other allocation of a portion of the tidelands funds refers solely to the allocation of royalties from mineral leases to the parish in which the production occurs. Article 7, Section 4(E). See also Part V, questions 1-3 below. If there were doubt, this intention is made clear in the convention debates. 34 Proceedings (103rd day, December 18) 133-34, (104th day, December 19) 2-9.
With regard to the taxpayers' contention:
Article 14, Section 10, provides for the deposit of tidelands funds into the state treasury for payment of the state's bonded indebtedness or for investment for such purpose. We have further held that the intent of the provision prevents use of such funds in the bond security and redemption fund to pay debts maturing during the current fiscal year.
However, as we have noted, the intent of the provision does not prohibit use of the tidelands funds (deposited in the treasury and invested for such purpose) from being used to any bonded indebtedness which matures in subsequent fiscal years. From this bond and security fund, without the necessity of legislative appropriation (by virtue of Article 7, Section 9(B)), an amount is automatically allocated each year to pay currently maturing debt. But the provision does not require that such allocation shall be only from funds otherwise reverting to the general fund; nor does it prohibit using other funds available for debt reduction (such as the tidelands funds), as may be determined by the political instrumentalities of the state (see Part V, Question 6) entrusted with power to make the decision.
The effect of the provision is not to designate the particular state monies in the state treasury which shall be allocated for retirement of currently maturing debt. It is primarily only to give holders of currently maturing bonds "a first lien and privilege and privilege on the funds in the Bond Security and Redemption Fund", La. R.S. 39:1402(C), and to direct the legislature to authorize the treasurer to pay such bonds without the legislative appropriation otherwise normally required, La.R.S. 39:1366(4).
Article 7, Section 9(B) (quoted in footnote 12 above) provides that "all state money deposited in the state treasury" shall be credited to the bond security and redemption fund. From this entire fund, a portion is allocated sufficient to pay currently maturing obligations of the state. The subsection constitutionalized the concept of a former statutory provision to the same effect[13]; its purpose was to assure a more favorable bond rating for Louisiana bonds (making them more desirable and permitting their sale at lower rates of interest) by assuring their payment first call from the treasury when they mature, without the necessity for legislative appropriation. See Proceedings (102nd day, December 17) 41-52, especially 43.
We are unable to find that the explicit provisions and purpose of Section 9(B) do not apply to tidelands funds deposited in the treasury and thus (although invested as required by law, as are other state funds, general special, see La.R.S. 39:462) forming part of the "state money" deposited in the state treasury required to be available for allocation to pay bonded indebtedness in the fiscal years following their receipt.[14]
In finding a contrary intent, the majority relies upon an excerpt of a statement by Senator DeBlieux, who was author of an amendment which lost by a vote of 73 to *193 16. Proceedings (103rd day, December 18) 134-39. The purpose of the amendment was to delete all portions of Section 10 other than requiring their deposit into the state treasuryto completely undedicate the funds (Delegate David Conroy noted in opposing it, that the amendment "totally undedicates the funds that would be received in this lump sum settlement", p. 135). The excerpt of Senator DeBlieux's comments cited by the majority, p. 134, was only to the effect that deposit of tidelands funds (undedicated) into the general fund would not handicap "operation and management of our funds" (immediately preceding majority's quotation) because, upon deposit in the state treasury, the bond security and redemption fund was the mechanism for good debt management.
The defeat of the senator's amendment was not a defeat of any proposal to make tidelands funds subject to being included in the bond security and redemption fund. It was a defeat of a proposal to place tidelands funds in the general funds available, except for the bond security and redemption fund allocation (as with all other monies in the state treasury), for spending for any purpose whatsoever. The ascription of any constitutional intent to this out-of-context excerpt of the statement of the author of a defeated (16-73) amendment is without legal foundation, and it flies in the face of the express language of the constitution (and the specific intent reflected by the debates) that all monies in the state treasury shall be credited to the bond security and redemption fund for the purpose of securing (not necessarily paying) state debt.
By our proposed holding, we would not intend to imply that tidelands funds must be used to pay debts maturing in the fiscal years next succeeding their receipt, simply because they are available for inclusion in the bond security and redemption fund for those years and thus available for this purpose. So long as (by requirement of Section 10) the funds are used to reduce the bonded indebtedness of the state existing on the date of their receipt, the constitutional provisions at issue do not direct the particular debts to which these funds are applied, as decided by the political instrumentalities of our government in whom this power is entrusted by our constitution and statutes. In short, we find no constitutional strait-jacket on the manner in which, in the fiscal years succeeding that in which received, the tidelands funds are to be used to reduce the bonded indebtedness of the state existing on the date of their receipt.
Fiscal Decisions and Economic Policy Primarily for the Political Branches of Government, not the Courts
We are mindful of the strong but opposing policy arguments made both by the taxpayers and by the state.
On the one hand, the taxpayers contend that the best economic advantage to the state will result from application of the tidelands funds to reduce longterm indebtedness at a discount, with consequently longrange savings in principal and interest.
On the other hand, with equal force, the state contends that, in view of the present high-interest borrowing rates and the constant inflation of construction costs, the state's longterm economic advantage may best be served by using the tidelands funds to retire soon-maturing indebtedness and using any thus-freed current revenues to build, for cash and without borrowing (at present high-interest rates), needed capital improvements (which must later, if not today, be constructed at much greater capital cost to the state).
The function of the courts, however is not to make political determinations as to fiscal questions where, as here, the constitution does not dictate their decision.
In the absence of restriction by the constitution, the choice of fiscal and economic policies is entrusted to the executive and legislative branches of our government, not *194 to the judicial branch. The function of the judiciary is not to weigh the wisdom or unwisdom of policy choices constitutionally open to the political officials and instrumentalities of the state entrusted with the responsibility and duty to make them; the judiciary's function is limited to ruling upon the legality of these policy decisions, and whether the constitution restricts the political choices open to those empowered to choose.
Finding no such constitutional restriction here, we would find no occasion for judicial enforcement of the concepts advanced either by the taxpayers or by the state, however meritorious and wise they respectively may or may not be.
V. Ancillary Issues and Questions Posed for Declaratory Judgment
As we indicated at the outset of this opinion we are also of the belief that the majority errs in refusing to answer certain practical questions of administration of the public debt posed by this declaratory judgment action. Were our view to prevail, we would address ourselves to these nine questions relating to the judicial interpretation of Article 14, Section 10, (Table 1), as to which declaratory relief is requested by the governor's suit against the state treasurer. The questions posed, and our answers thereto, would be as follows:

Question 1
"Does the phrase 'Funds derived from offshore mineral leases' in Article XIV, Section 10, mean only the royalties, rentals and other lease moneys due Louisiana as lessor of offshore lands, or does it also include the severance taxes collected by Louisiana as the taxing sovereign of those lands?"
The "tidelands" litigation involved a dispute between the state of Louisiana and the federal government as to ownership of offshore areas. The monies received on September 15, 1975, resulted from judicial decision and subsequent agreement as to Louisiana's ownership of some of the disputed area. See United States v. State of Louisiana, 382 U.S. 288, 86 S.Ct. 419, 15 L.Ed.2d 331 (1965). Louisiana then received from sums held in escrow certain payments attributable to or as a consequence of mineral leasing and production on areas now recognized as Louisiana's.
On September 15, 1975, Louisiana received two payments from the federal government in the total amount of $136,296,015.43. One check was for $96,198,938.68 payable to the "Treasurer of the State of Louisiana" and represented proceeds attributable to leasing and mineral production within the area now determined to be Louisiana's. The other check was for $40,157,176.75 payable to the "Collector of Revenue State of Louisiana" and represented the liability for severance taxes upon mineral production from that area during the period of litigation.
The specific issue raised by this question is whether the latter check is part of the "tidelands funds" which, by Article 14, Section 10, must be devoted to the reduction of pre-existing debt; or whether, instead, it is part of the tax revenues of the state payable into the state treasury and, with exceptions not here pertinent, available for appropriation by the legislature. See La.R.S. 47:645.
The taxpayers argue, opposed by all other parties to this litigation, that the severance tax proceeds are "funds derived from offshore mineral leases" (Section 10), no less than royalty payments; and thus, equally, constitute part of the tidelands funds dedicated to debt reduction. The state contends that, to the contrary, the severance tax proceeds are not "derived from the leases" but, rather, independently of the leases result from the state's taxing power.
We find that the latter view is better supported by legal theory and is correct in *195 the light of a context constitutional provision, the constitutional debates, and the historical background of the tidelands litigation.
A severance tax is imposed upon all natural resources, including minerals, severed from areas subject to Louisiana's jurisdiction. La.R.S. 47:631 et seq. The tax is not upon the minerals produced nor upon their ownership; it is an excise tax imposed upon the privilege of severing our natural resources. Bel Oil Corporation v. Roland, 242 La. 498, 137 So.2d 308 (1962) and jurisprudence therein cited.
In the instant case, those who severed the minerals from Louisiana tidelands were liable for the tax from the moment of severing. La.R.S. 47:635. However, since the federal government was also claiming jurisdiction to the area at the time, Louisiana did not require the producers to pay the tax then; instead, they were permitted to deposit the amount of the tax due into the federal escrow funds, subject to delivery of these funds to Louisiana if and when this state was decreed to be the owner of the area (as it was, with regard to the severance tax proceeds here at issue). See: Section 9(c), Interim Agreement between the United States and the State of Louisiana, dated October 12, 1956; also, 11 U.S.C.A. § 1335(9) of Outer Continental Shelf Lands Act of 1953.
The interim agreement, at the cited Section 9(c), specifically provides that, "on determination that such funds are derived from an area determined to be owned by the State of Louisiana", they should be "paid to the Collector of Revenue of the State of Louisiana, or the official or agency then designated by Louisiana law to receive such payments, and shall be credited by the State only against taxes which may be due and payable and not theretofore paid to the state * * *."
The intent of the payment was thus to satisfy the producer's severance tax liability for production from an area now determined to be Louisiana's. During the period of litigation, Louisiana had not sought to enforce payment of the severance tax on production in an area it claimed, out of fairness to the producers and in an effort to encourage production. Nevertheless, once the area was determined to be Louisiana's, the producers were liable to this state for these severance taxes. The payment had been held in escrow at the time of severance and is now received by the state for the specific purpose of satisfying this severance tax liability, undoubtedly due now that the area within which the production occurred has been determined to be owned by Louisiana at the time of production.
The 1974 constitution itself recognizes a distinction between Section 10's receipt of "funds derived from mineral leases" (which thus form part of the tidelands funds dedicated to debt reduction), as contrasted with the delayed receipt of severance tax proceeds attributable to offshore production. Article 14, Section 11 ("Prescription; Tidelands Taxes"), immediately follows Section 10 ("Offshore Mineral Revenues; Use of Funds"). Section 11 provides that collection of severance taxes due on offshore production within the disputed areas shall not prescribe until three years after the litigated controversy is finally resolved, waiving interest and penalties in the meantime.[15] The severance *196 tax liability owed to the state was thus provided for separately from the leaserental funds likewise owed, both to be payable only upon determination that the disputed area was owned by Louisiana.
The state contends, correctly we believe, that the constitutional distinction between Section 10's "offshore revenues" and Section 11's "tidelands taxes" can reasonably support the conclusion that the latter are not included within Section 10's "funds derived from offshore leases", which latter must be used for reduction of pre-existing state indebtedness. Some additional support for this contention is furnished by the constitutional debates in connection with adoption of Section 10.
The delegates did not contemplate that severance tax receipts were included in Section 10's debt-dedicated tidelands funds. This may reasonably be inferred from their concern to assure that the section specifically recognized the allocation to local governments of their share of the mineral lease royalties to which they were entitled by (now) Article 7, Section 4(E). 34 Proceedings (103rd day, December 18) 133-34, (104th day, December 19) 2-9. Those diligently protecting the interests of local governments did not once raise the question of the equivalent need to entitle local governments to a share of the severance taxes collected, see Article 7, 4(D), apparently because neither they nor any other delegate considered that such severance taxes were subject to the debt-reduction dedication of Section 10.
We are also reinforced in this conclusion by the conceptual distinction between taxes paid to the state upon production (severance) of minerals, as contrasted with revenues derived from the lease itself.[16]
A lease is a contract between a lessor and a lessee, by which the lessee's consent obligates himself to pay the rent. Civil Code Articles 2669, 2679, 2710(2). The payments by the mineral lessees (the producers) to the mineral lessor (the state) for the granting and maintenance of these mineral leases are lease-revenues of this consensual nature, La.R.S. 31:123 (1974) (incorporating in the new mineral code prior statutory jurisprudential concepts). The state's right to receive them is based upon the state's proprietary ownership of the property leased by it.
It is therefore conceptually accurate to speak of such lease-payments or such lease-rentals as "funds derived from offshore leases" (Article 14, Section 10) or as "revenues derived from tidelands mineral leases" (see predecessor provision of 1921 constitution, set forth in Table 1).
Distinguishably, the right to tax is a sovereign attribute of a government, existing without consensual agreement, over persons and property subject to that government's jurisdiction. A severance tax is one imposed on the production (severance) of minerals, independent of any mineral lease; it is a payment derived from the state's power to tax, not from its power to lease.
Conceptually, therefore, a severance tax when paid is not a revenue or fund "derived from" a mineral lease.
*197 We are finally reinforced in this construction of the Section 10 by its wording limiting debt-dedicated tidelands funds to those "derived from offshore mineral leases". If the taxpayers' contention were correctthat all funds held in escrow incident to the disputed offshores were subject to Section 10's dedication to debt reduction, then this limiting phrase should be deleted from the provision, so that it would, instead of its present wording, define such tidelands proceeds as: "Funds. . . held in escrow under agreement between the state and the United States."
The constitution does not provide this all-encompassing definition. We are unwilling by judicial interpretation to strike from the constitutional provision the constitutional limitation of dedicated tidelands funds to those "derived from offshore mineral leases."
To summarize, we would answer Question 1 as follows: The payment of severance taxes upon the offshore production is not included within the "funds derived from offshore mineral leases" which must, by Section 10, be used for debt-reduction.

Question 2
"If the phrase "Funds derived from offshore mineral leases' in Article XIV, Section 10, includes severance taxes, then does the phrase 'except the portion otherwise. . . dedicated by this constitution' in that same constitutional provision exclude that part of the severance taxes dedicated to the parishes by Article VII, Section 4(D)?"
In our previous answer we concluded that Section 10's "funds derived from offshore mineral leases" does not include monies the state receives to pay severance tax liability upon offshore production. Therefore, Section 10's dedication provision does not refer to the allocation to local governments affected of a share of severance tax proceeds, as provided by Article 7, Section 4(D).[17] Nevertheless, by reason of this latter constitutional allocation, the governing authorities of the parishes in which the severance or production occurred should be entitled to receive their share of offshore severance taxes collected by the state.

Question 3
"Does the phrase 'except the portion otherwise . . . dedicated by this constitution' in Article XIV, Section 10, refer to that portion of the royalties dedicated to the parishes by Article VII, Section 4(E)?"[18]
Yes. See Part IV of our opinion, and our answer to Question 1 of Part V.

Question 4
"Article XIV, Section 10, provides that the funds derived from mineral leases "shall be deposited in the state treasury' and 'except the portion otherwise allocated. . . by this constitution, shall be used . . .' for the purpose set forth therein. Article VII, Section 9(B), provides that `all . . . money deposited in the state treasury shall be credited *198 to . . . the Bond Security and Redemption Fund,' and that `In each fiscal year an amount is allocated from the bond security and redemption fund sufficient to pay all obligations which are secured by the full faith and credit of the state and which become due and payable within the current fiscal year' and that `Thereafter, except as otherwise provided by law, money remaining in the fund shall be credited to the state general fund.' Does not the clause `except . . . otherwise allocated' in Article XIV, Section 10, refer to the allocation by the Bond Security and Redemption Fund in Article VII, Section 9(B) which requires that on July 1, 1976, there shall be allocated an amount sufficient to pay all obligations which are secured by the full faith and credit of the state and which become due and payable during fiscal 1976-1977?"
For the reasons more fully set forth in parts III and IV of this opinion, we would answer this question as follows:
(1) The reference to "the portion otherwise allocated by this constitution" in Article 14, Section 10, does not refer to the allocation to the bond and security redemption fund required by Article 7, Section 9(B).
(2) However, any of the tidelands funds still on deposit in the state treasury (or invested in connection with such deposit) as of July 1, 1976 (the date the question designates as commencing the 1975-76 fiscal year) are available for, and may be (but need not be) allocated for payment of the obligations maturing during fiscal 1976-77. This results because of the express wording of Article 7, Section 9(B), not by reason of any provision of Article 14, Section 10.

Question 5
"Does not the language of Article XIV, Section 10, providing that 'these funds [derived from off-shore mineral leases] . . . . . . shall be used by the state treasurer to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state . . .' require the use of such funds for the payment of the currently maturing bonded indebtedness?"
For the reasons more fully set forth in parts III and IV of this opinion, we would answer this question as follows: No, Article 14, Section 10, does not require the use of the tidelands funds for the payment of currently maturing bonded indebtedness.

Question 6
"If that language does not prohibit the use of the funds to pay the currently maturing bonded indebtedness, then (a) is the treasurer granted the discretion to determine the manner in which the funds will be expended to reduce the bonded indebtedness of the state, or (b) does that discretion lie with the legislature by virtue of the constitutional provisions, Article III, Section 16(A) and (C), and Article VII, Section 10(A), granting the legislature the exclusive power to expend state funds, or by virtue of possession, by the legislature, of the right to exercise all powers which it is not specifically prohibited from exercising by the constitution?"
Article 14, Section 10, provides that tidelands funds "shall be used by the state treasurer" to reduce pre-existing bonded indebtedness. The primary issue posed by Question 6 is whether this provision was intended to vest in that official sole discretion as to the manner in which the tidelands funds are used for that purpose.
The predecessor constitutional provision (see Table 1), retained in substance by Section 10, clearly provided that the tidelands funds were to "be expended by the state treasurer, when authorized and empowered to do so" by a political instrumentality entrusted by the former constitution with that choice. The constitutional debates reflect *199 no intent whatsoever to vest sole discretion in a single official, the treasurer, to make this far-reaching fiscal decision; nor to change that official's merely ministerial duty to apply the tidelands proceeds to pre-existing debt as authorized and directed by the political instrumentalities empowered to determine the overall fiscal policy of the state.
We are re-enforced in our conclusion that the answer to Question 6(a) is "No" by a consideration of the constitution as a whole.
First of all, with regard to the state treasurer, Article IV, Section 9, provides that this official "shall be responsible for the custody, investment, and disbursement of the public funds of the state, except as otherwise provided by this constitution" and that, in addition to the duty to report annually on the financial condition of the state, this official "shall have other powers and perform other duties authorized by this constitution or provided by law."[19]
This constitutional section was not, for instance, intended to confer upon the treasurer sole discretion as to how or when or for what purpose to "disburse" public funds; legislative appropriations principally determine the purpose and manner of disbursement of the state monies. This constitutional provision was not, for instance, intended to vest in the treasurer sole discretion as to the manner in which the "custody" of state funds will be maintained; historically, for instance, the manner by which the treasurer exercised custody was subject to legislative oversight and regulation, see, e.g., La. R.S. 39:462 (1963) (requiring investment of idle state funds and specifying types of investment). Nor was the provision intended to confer upon this official sole discretion as to the manner in which state funds are "invested"; not only historical precedent, but the 1974 constitution's Article 7, Section 13 ("All money in the custody of the state treasurer which is available for investment shall be invested as provided by law"), advise to the contrary.
Thus, with regard to the state treasurer, the constitution confers upon this official general ministerial responsibility for the custody, investment, and disbursement of state funds; but it indicates no intent to confer upon this official an autonomous control and completely discretionary powers to disburse or invest these monies of the state. Not only does the constitution not do so; rather, it expressly confers the ultimate power and duty to decide such fiscal issues upon the governor and the legislature, who are (after all) the political officers primarily chosen by the people to determine political policies and programs of the day.
Article 14, Section 10, unambiguously provides that tidelands funds "shall be deposited in the state treasury." With the exception of allocations expressly provided (such the first call for payment of currently maturing debt), no state money in the treasury shall be expended without a legislative appropriation. See Article 7, Section 10(A): "Except as otherwise provided by this constitution, money shall be drawn from the state treasury only pursuant to an appropriation made in accordance with law." See also, to the same effect, Article 3, Section 16(A). Once the tidelands funds are in the state treasury, *200 they cannot be expended from it without legislative authorization, except if their allocation without appropriation is constitutionally required by express constitutional provision, such as to service currently maturing debt, Article 7, Section 9(B), or to pay to local governments their share of taxes or mineral royalties, Article 7, Section 4(D)(E).
With regard to the payment of the indebtedness of the state, again the constitution explicitly vests in the legislature the power to make determinations as to which debts will be paid and what funds used to pay them (subject, of course, to the automatic allocation of funds in the treasury to pay currently maturing obligations, Article 7, Section 9(B), which constitutionally must take place whether or not the legislature acts in the matter):
Article 3, Section 16(C) provides: "The general appropriation bill shall be itemized and shall contain only appropriations for the ordinary operating expenses of government, public charities, pensions, and the public debt or interest thereon."
Tidelands funds, with the exception of the annual ten percent permitted for construction by Section 10's last sentence, may not be used for any other purpose than reducing the pre-existing state indebtedness. Nevertheless, if they are used to pay currently maturing obligations in the fiscal years next succeeding their receipt, current tax monies may be available to pay cash for public construction, if the political organs of the state determine such are needed, instead of borrowing money on the open market at the present high rates of interest[20] or of increasing present taxes if at a time of recession.
The choice to use such tidelands funds to pay debt maturing in near years, rather than distantly in the future, is closely related to the overall power and duty of the governor and legislature to make the ultimate political decisions as how best to use the state's entire fiscal resources; for instance, either to pay in advance debt not to mature for many years and save interest over the years, or, instead, to construct at the lower costs of today over the (presumably) higher costs of tomorrow. The benefits or demerits of this decision will, of course, depend on a weighing of values in the light of the economic circumstances at the time the decision is made, and they will vary according to the circumstances of that time. But, in any event, the constitutional responsibility for making these political decisions is vested in the governor and the legislature, not in the courts nor in the state treasurer.
The constitution envisages that overall responsibility shall be vested in the governor and the legislature to determine how the state's fiscal resources should be used for operating expenses, debt reduction, and capital improvements (either by appropriation or by issuing bonds); subject (except for veto) to final determination by the legislature.
The governor is required annually to submit both an operating and a capital budget. Article 7, Section 11; see also Article 4, Section 5(D). The legislature alone appropriates monies from the state treasury, by either a general or special appropriation bill, Article 3, Section 16(C), (D), Article 7, Section 10(A), but it is required not to appropriate more than the anticipated state revenues, Article 7, Section 10(B). The legislature must approve the capital budget, Article 7, Section 6(B), and determine if monies should be borrowed for capital expenditures, Article 7, Section 6(A) or should be applied upon the state indebtedness, Article 3, Section 16(C).
The general intent reflected by the 1974 constitution is to strengthen legislative power over the policies and processes of *201 government and to clarify and simplify overall executive responsibility in the governor and overall executive responsibility in the legislature.[21] The 1974 charter ended the fragmentation of governmental power represented by many of the provisions of the 1921 constitution, and it deleted from constitutional status many of the specialized agencies and powers detailed by that lengthy former document. A specific purpose reiterated throughout the convention debates was to eliminate fund dedications and autonomous satrapies of power not subject to the current will of the people as expressed by their currently elected governor and legislature.
The constitutional debates adopting Section 10 expressly indicates its purpose as to retain the substance of the predecessor constitutional provision (see Table 1). No intent whatsoever is reflected by these debates that the treasurer's merely ministerial function in applying tidelands funds to reduce state indebtedness was to be expanded so as to vest in this official sole discretion, independent of the political processes of the state, as to which debts should be retired and when. As noted, it would be inconsistent with the general framework and philosophy of government expressed by the 1974 charter if in fact exclusive discretion had so been vested in a single official.
We are thus unable to conclude that, by Section 10, the primarily ministerial duties of the state treasurer designated by the constitution[22] were enlarged so as to confer upon this official sole and exclusive discretion to make political fiscal decisions which in effect would determine, whether or not desired by the legislature, major fiscal policies concerning debt reduction, preparation and adoption of operating and capital budgets, capital improvements (and borrowing or taxing to pay for them).
If we were in doubt, however, a state constitution should receive a judicial construction in favor of legislative power, in the absence of unambiguous constitutional limitation thereupon. Hainkel v. Henry, 313 So.2d 577 (La.1975); In re Gulf Oxygen Welders Trust, 297 So.2d 663 (La. 1974); Kane v. Louisiana Commission on Governmental Ethics, 250 La. 855, 199 So. 2d 900 (1967); State v. Guidry, 247 La. 631, 173 So.2d 192 (1965); State v. Macaluso, 235 La. 1019, 106 So.2d 455 (1958); State ex rel. Labauve v. Michel, 121 La. 374, 46 So. 430 (1908). This is so because, as stated in Hainkel v. Henry, cited above, at 313 So.2d 579: "A general principle of judicial interpretation of a state constitution is that, unlike the federal constitution, a state charter's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature."
As stated by Professor W. Lee Hargrave of the Louisiana State University Law School and a leading figure in the drafting of the 1974 constitution, see 36 La.L.Rev. 533 (1975):
"Though Louisiana courts have accepted and applied the principle that a state legislature possesses plenary power to do anything not prohibited by the constitution even absent a grant of power, the fact that *202 the 1921 constitution contained so many grants of power, often grants coupled with explicit or implicit limitations, resulted in the general principle being applied less often than it might otherwise have been. The 1974 constitution, deliberately short, intentionally concise, and knowingly avoiding grants of power, will require application of the principle more often. The convention used the principle as its basic starting point,[23] and a narrow construction of legislative power under the document would thwart its purpose of giving more flexibility to the legislature."
In summary, the answer to Question 6 should be that the legislature, not the state treasurer, has the discretion to determine the manner in which the tidelands funds are used to reduce bonded indebtedness; subject, of course, to the limitation previously found that tidelands funds may not be applied to reduce debt maturing during the fiscal year of their receipt.

Question 7
"Regardless of which public body or officer has the discretion to determine the manner in which the bonded indebtedness of the state will be reduced by expenditure of the funds derived from offshore mineral leases, does the provision 'If any of these funds [derived from offshore mineral leases] cannot be. . . expended within one year . . ." require expenditure of these funds for retirement of the state's bonded indebtedness within one year of receipt?"
The answer to this question should be "No".
In the first place, in the context of the entire text of Section 10, the quoted clause does not purport to state a time-limit during which the tidelands funds must be used for debt-reduction. The clause is contained in the section's last sentence, which relates only to the legislature's power to appropriate for capital improvements and land-acquisition a minor portion of any tidelands funds not yet actually expended on debt reduction; the clause, in context, modifies the sentence and merely specifies the time-period which must elapse before this minor diversion from debt-reduction may take place.
In the second place, the specific intent of Section 10's provision permitting investment of tidelands funds for eventual debt-reduction, rather than immediate expenditure for such purpose, was to permit full flexibility to the political officers and processes to use these funds for debt-reduction purposes with utmost flexibility, so as to assure their use for the best financial interests of the state in the judgment of those officials and agencies constitutionally and statutorily invested with responsibility and duty in this regard. See footnote 10 above and surrounding text of our opinion.

Question 8
"If the funds have not been expended within one year, may 'the legislature. . . appropriate annually, for capital improvements or for the purchase of land, ten percent of the remaining funds not to exceed ten million dollars in one year'?"

The answer to this question should be "Yes". As the last sentence of Section 10 specifically provides, after September 15, 1976 (one year after the date of the receipt *203 of the present tidelands funds), the legislature may annually appropriate, for capital improvements and land acquisition, ten percent (not to exceed ten million dollars) of any of the tidelands funds still on deposit at the time in the state treasury and not yet previously expended to reduce the state indebtedness.

Question 9
"Is `the existing bonded indebtedness of the state' referred to in Article XIV, Section 10, limited to direct obligations of the state, or does it also include obligations of other taxing authorities but which are secured by the full faith and credit of the state?"
As noted in part II above, Section 10 is intended to continue in substance a predecessor provision of the 1921 constitution (see Table 1). That provision directed tidelands funds' use to reduction of the "indebtedness of the state of Louisiana or its agencies, boards and commissions". The constitutional debates reflect no intent to change the usage for such purposes.
Furthermore, the 1974 constitution's Article 7, Section 6(C), treats of the state debt as including "all bonds or other evidences of indebtedness issued by the state directly or through any state board, agency or commission" for the payment of which is pledged the full faith and credit of the state. In our opinion, this may be considered as indicating that the "bonded indebtedness of the state" includes not only direct obligations of the state itself, but also that of other taxing authorities secured by the full faith and credit of the state.
We therefore would answer the question to such effect. (We do not read the judgment and decree of the trial court granting a preliminary injunction in the citizens' suit as providing otherwise; if we are incorrect, upon the remand it could have been modified.)
For the reasons stated herein above were our view to have prevailed we would have remanded to the district court the taxpayer's suit, Fenner et al v. Parker, Treasurer, Civil Docket No. 185,033, Nineteenth Judicial District Court, for further proceedings in accordance with law and consistent with our opinion, and in the governor's suit for declaratory relief, Edwards, Governor v. Parker, Treasurer, Civil Docket No. 190,239, Nineteenth Judicial District Court, we would have rendered judgment declaring, with regard to the issues raised therein, in accordance with our proposed answers to Questions 1 through 9, part V of this opinion.
DENNIS, Justice (concurring in part and dissenting in part).
I respectfully concur in the majority holding that the tidelands royalty and severance tax funds may not be used except to purchase, retire or pay unmatured bonded indebtedness or to invest these funds for that purpose. However, I respectfully disagree that the purchase, retirement or payment of unmatured bonded indebtedness cannot occur within the same fiscal year as the receipt of the tidelands funds. The constitution essentially requires prepayment of bonds with tidelands funds as correctly held by the majority but it does not specify the extent of time by which the payment of a bond must precede its maturity. Furthermore, in my opinion, the constitution does not prohibit the use of tidelands funds for the payment of matured bonds if the funds have been previously invested for such purpose at a time when those bonds were unmatured if this should have been properly determined to be the most advantageous debt retirement strategy for the state to follow. In all other respects I agree with the majority opinion.
NOTES
[1] In our opinion below, we have suggested how these questions should be answered.
[2] The "purchase" of outstanding indebtedness refers to the issuer's buying outstanding bonds in advance of maturity, generally at a discount from the face amount due. The evidence on the exception of no right of action indicates, for instance, that holders of longterm low-interest bonds of the state might be willing to sell them at perhaps seventy percent of the value, in order to have their money immediately available to lend on the present market with its presently high interest rates. (The state points out that the discount might be considerably less if the state effectuated a policy of purchasing the presently-unwanted long-term low-interest bonds (and consequently creating a demand for them), and that the ultimate effect might be to relieve the state of low-interest debt so to enable the former bondholders to purchase high-interest bonds if currently issued by the state to finance needed capital improvements, with the bond-industry to receive the benefits of the costs of purchasing old bonds (and of issuing new bonds) at the cost of the net proceeds to be paid or received by the state.) The purchase of outstanding bonds, either by use of tenders or on the open market, is also recognized as one of the methods to accomplish an early retirement of debt. Moak, administration of Local Government Debt 391 (1970).
[3] To "retire" bonds is a broad term that includes payment either when due or in advance of maturity, as well as retirement by purchase. See 37A Words & Phrases, verbo "Retire", 204-05 (1950). One of the decisions cited, McClain v. Commissioner of Revenue, 110 F.2d 878, 879 (CA 5, 1940), for instance, citing dictionaries, defines the word "retire", in the context there used, as "to recover, redeem, regain by payment of a sum of money [;] . . . to withdraw from circulation, or from the market; to take up and pay, as to retire bonds or a note."

See also Webster's Third New International Dictionary, verbo "retire" (verb, transitive), meaning 4, p. 1939 (1961). The state, of course, contends that, since used in the disjunctive ("or") with other methods of reducing the bonded indebtedness (and since, under drafting principles of the constitution, cumulative reiteration of synonyms was disfavored, rejecting this common practice of legalese), the narrow meaning of the term was intendedi.e., to retire bonds by paying them at maturity.
[4] To "pay" a bond could mean either to pay it at maturity or to pay it before maturity, generally by reason of a bond provision so permitting early redemption. The state contends that the latter meaning is specified by the qualifying phrase, "in advance of maturity", which arguably modifies only the last word in the series, "purchase, retire, or "pay".
[5] The taxpayers principally contend that Article 7, Section 9(B) places such restriction upon the use of tidelands funds. We will discuss this contention further in part IV of the opinion below.
[6] The Constitution of 1921 contained 255,000 words, as compared with the Constitution of 1974's 35,000 words.
[7] A "callable" bond is one "subject to a demand for presentation for payment before maturity." Webster's Third New International Dictionary, verbo "callable", p. 318 (1961). In Calvert (ed.), Fundamentals of Municipal Bonds 165 (1972), a "callable bond" is defined as: "A bond which is subject to redemption prior to maturity at the option of the issuer".
[8] The tidelands funds shall be used "to purchase, retire, or pay in advance of maturity the existing bonded indebtedness of the state or shall be invested for such purpose." (Italics ours.)
[9] See, for instance, the argument of Delegate Senator B. B. Rayburn, chairman of the finance committee and recognized authority on the state's fiscal policy, at 34 Proceedings (103rd day, December 18) 133.
[10] At 34 Proceedings (104th day, December 19) 11, Delegate Walter Champagne, respected member of the finance committee and author of the floor amendment explicitly permitting investment of the funds to pay unmatured obligations as they came due (as in the predecessor constitutional provision), rather than requiring immediate use of them to pay such unmatured obligations, explained its purpose as follows:

"Yesterday, when it was discussed, there were some people who were aware of possible possibilities that that [tidelands] money would be used for other purposes than to retire state debt. There were othersI think Senator Rayburn asked the question: Suppose you can get a higher rate of percent than you can on retiring bonds at, for instanceor at four percentand you can get eight percent on an investment? This provides that, beyond doubt, the bonded indebtedness will be retired first. In addition to that, it [the amendment] does allow the state, if they so choose to invest this money, to make money in which they have to retire the bonds of the state, or the indebtedness. So, this makes it abundantly clear that you're not going to handicap them in any way. They can get all the money they can; but, in making this money, it's for the purpose of retiring the state debt. So, they could, in essence, if they had some unusually low rates that they didn't want to pull out at that time, but they wanted to invest the money for the purpose of making additional money to retire thosethis is just good banking policy that the state could engage in. . ." (Italics supplied.)
With virtually no discussion after this presentation, the amendment was adopted by a vote of 91 to 1. Immediately thereafter, the entire section as amended was adopted by a vote of 101 to 0. (See p. 12, immediately following Mr. Champagne's presentation.)
[11] The essence of the constitutional debates was only to the effect that the tidelands proceeds themselves be used to reduce the bonded indebtedness of the state existing on the date of their receipt. For instance, Delegate David Conroy, a highly respected expert on the financial aspects of government explained (in defending an attempt to remove the limitation upon the use of tidelands funds), see 34 Proceedings (103rd day, December 18) 130:

". . . Section 10 explicitly deals only with one situation in which the state will receive, hopefully, a great deal of money in one year, it is not a continuing thing; it won't continue after that point as far as what Section 10 deals with . . . What it says is when the state gets that money, the first call on that money is going to be to retire the state debt."
". . . I think the intent is clear, the intent is to avoid the possibility of a legislature expending monies that are suddenly received in one year in a great windfall for something other than first seeing to it that this state's debt's taken care of."
[12] Article 7, Section 9(B) in full reads:

"Bond Security and Redemption Fund. Subject to contractual obligations existing on the effective date of this constitution, all state money deposited in the state treasury shall be credited to a special fund designated as the Bond Security and Redemption Fund, except money received as the result of grants or donations or other forms of assistance when the terms and conditions thereof or of agreements pertaining thereto require otherwise. In each fiscal year an amount is allocated from the bond security and redemption fund sufficient to pay all obligations which are secured by the full faith and credit of the state and which become due and payable within the current fiscal year, including principal, interest, premiums, sinking or reserve fund, and other requirements. Thereafter, except as otherwise provided by law, money remaining in the fund shall be credited to the state general fund."
[13] See Act 26, Section 2, of the Extraordinary Session of 1968, enacting La.R.S. 39:1402.
[14] We do not read the judgment and decree of the trial judge in the taxpayers' suit as providing otherwise in the preliminary injunction issued by it. Were we incorrect, upon remand the injunction could have been modified accordingly.
[15] Article 14, Section 11 ("Prescription; Tidelands Taxes") provides:

"No state, district, parish, or other tax, license, fee, or assessment of any kind, and interest charges and penalties attaching thereto, which are imposed, due, or collectible on any property, minerals or the severance thereof, or due or payable by any person, firm, or corporation on any business operation or activity within the tidelands area in dispute between the state and the United States and within the state's historic gulfward boundary three leagues from coast as established and defined by the act of Congress of April 8, 1812, which admitted this state into the Union, and as redefined in Louisiana Act No. 33 of 1954, shall prescribe until three years after the thirty-first day of December in the year in which the controversy existing between the United States and this state over the state gulfward boundary is finally resolved and settled in accordance with law. However, no interest charge or penalty shall be assessed or collected on any such tax, license, fee, or assessment if it is paid within one year after the thirty-first day of December in the year in which the controversy is finally resolved and settled."
[16] We note, for instance, that Article 9, Section 6, debated and adopted immediately before Article 14, Section 10, provides that "Revenues and royalties obtained from minerals beyond the seaward boundary of the state belong to the state." (Italics ours.) 34 Proceedings (103rd day, December 18) 113-123. The right to receipt because of ownership is conceptually different than the right to tax.
[17] Article 7, Section 4(D) provides: "Severance Tax Allocation. One-third of the sulphur severance tax, but not to exceed one hundred thousand dollars; one-fifth of the severance tax on all natural resources, other than sulphur or timber, but not to exceed five hundred thousand dollars; and three-fourths of the timber severance tax shall be remitted to the governing authority of the parish in which severance or production occurs."
[18] Article 7, Section 4(E) provides: "Royalties Allocation. One-tenth of the royalties from mineral leases on state-owned land, lake and river beds and other water bottoms belonging to the state or the title to which is in the public for mineral development shall be remitted to the governing authority of the parish in which severance or production occurs. A parish governing authority may fund these royalties into general obligation bonds of the parish in accordance with law. The provisions of this Paragraph shall not apply to properties comprising the Russell Sage Wildlife and Game Refuge."
[19] Article 4, Section 9, provides in full:

"There shall be a Department of the Treasury. The treasurer shall head the department and shall be responsible for the custody, investment, and disbursement of the public funds of the state, except as otherwise provided by this constitution. He shall report annually to the governor and to the legislature at least one month before each regular session on the financial condition of the state, and shall have other powers and perform other duties authorized by this constitution or provided by law." (Italics ours.)
Throughout the 1974 constitution, the term "law" is used in the sense of Article 1 of the Civil Code: "Law is a solemn expression of the legislative will." (Italics ours.)
[20] The legislature is authorized by two-thirds vote to issue bonds to "make capital improvements, but only in accordance with a comprehensive capital budget, which the legislature shall adopt." Article 7. Section 6(A).
[21] By Article 4, Section 1, for instance, the executive branch was required to be reorganized into twenty departments, and the legislature was given continuing powers of reorganization and reallocation of governmental function.
[22] By statute, the discretionary and policy-determination powers of the office may be and have been increased beyond the ministerial duties designated by the constitution. These indications of confidence in the ability and integrity of the present incumbent and of her distinguished predecessor, the late A. P. Tugwell, were not constitutionalized, however; the distinguished official of today is not necessarily tomorrow succeeded by one of equal caliber. The constitution attempted to provide a flexible framework for today and tomorrow. Flexibility for the legislative provision for additional duties was intended. See 8 Proceedings (27th day, August 8) 51.
[23] Professor Hargrave here in his footnote cites and quotes General Guideline No. 1 of the convention's manual on style and drafting which provided: "The general rule of state constitutional interpretation is: The provisions of a state constitution are limitations on the power of the people exercised through the legislature; what is not prohibited by the constitution is permitted. Therefore, the legislature is empowered to enact any law not prohibited by the constitution; it is unnecessary to specify, for example: The legislature has the power to enact laws providing for punishment for crime. In the absence of constitutional prohibition, the legislature has that power." 1 Official Journal of the Proceedings of the Constitutional Convention of 1973, 769 (1973).